No. 15-1335

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

BELMORA, LLC,

        Plaintiff-Appellee

    v.

BAYER CONSUMER CARE AG and BAYER
HEALTHCARE LLC

        Defendants-
        Consolidated Plaintiffs-
        Appellants

    v.

BELMORA, LLC, JAMIE BELCASTRO, and
DOES 1-10

        Consolidated Defendants-
        Appellees
_____

Appeal from the United States District Court
For the Eastern District of Virginia, Arlington Division
Case No. 1:14-cv-00847-GBL-JFA
Judge Gerald B. Lee
_____

BRIEF OF APPELLANTS, BAYER CONSUMER CARE AG
AND BAYER HEALTHCARE LLC
_____

Phillip Barengolts
Bradley L. Cohn
Andrew R.W. Hughes
PATTISHALL, MCAULIFFE, NEWBURY
HILLIARD & GERALDSON LLP
200 South Wacker Drive, Suite 2900
Chicago, Illinois 60606
(312) 554-8000

Robert J. Shaughnessy
Eric C. Wiener
WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C. 20005
(202) 434-5000

Attorneys for Appellants

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __15-1335__      Caption: _Belmora LLC v. Bayer Consumer Care and Bayer HealthCare v._
_Belmora LLC, Jamie Belcastro and Does 1-10_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Bayer HealthCare LLC_
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.      Does party/amicus have any parent corporations?                      ☑YES ☐NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
        Bayer HealthCare LLC is wholly owned by Bayer Corporation.  Bayer Corporation is a wholly owned subsidiary of Bayer World Investments B.V.  Bayer World Investments B.V. is wholly owned by Bayer AG.

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                      ☑YES ☐NO
        If yes, identify all such owners:
        Bayer AG

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: s/Robert J. Shaughnessy          Date:     April 16, 2015

Counsel for: Appellant, Bayer HealthCare LLC

# CERTIFICATE OF SERVICE
***************************

I certify that on     April 16, 2015     the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Craig C. Reilly, Esq.
craig.reilly@ccreillylaw.com
111 Oronoco Street
Alexandria, Virginia 22314
Tel: (703) 549-5354
JENNISON & SHULTZ, P.C.
John N. Jennison (VSB 36824)
John@JennisonLaw.com
2001 Jefferson Davis Highway, Suite 1102
Arlington, VA 22202-3604

LEASON ELLIS LLP
Martin B. Schwimmer
Lauren B. Sabol
81 Main Street, Suite 503
White Plains, NY 10601
Tel: (914) 288-0022
LANDO & ANASTASI, LLP
John L. Welch
One Main Street, 11th Floor
Cambridge, MA 02142

s/Robert J. Shaughnessy                    April 16, 2015
      (signature)                              (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __15-1335__    Caption: _Belmora LLC v. Bayer Consumer Care and Bayer HealthCare v._
_Belmora LLC, Jamie Belcastro and Does 1-10_

Pursuant to FRAP 26.1 and Local Rule 26.1,

Bayer Consumer Care AG
(name of party/amicus)


who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                        ☑ YES ☐ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
        Bayer Consumer Care AG is held by Bayer BV, domiciled in the Netherlands. Bayer BV is held by Bayer Hispania SA, domiciled in Spain. Bayer Hispania SA is held by Bayer AG, domiciled in Germany.

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                            ☑ YES ☐ NO
        If yes, identify all such owners:
        Bayer AG

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: s/Robert J. Shaughnessy          Date: April 16, 2015

Counsel for: Appellant, Bayer Consumer Care AG

## CERTIFICATE OF SERVICE
**************************

I certify that on ____April 16, 2015____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Craig C. Reilly, Esq.
craig.reilly@ccreillylaw.com
111 Oronoco Street
Alexandria, Virginia 22314
Tel: (703) 549-5354
JENNISON & SHULTZ, P.C.
John N. Jennison (VSB 36824)
John@JennisonLaw.com
2001 Jefferson Davis Highway, Suite 1102
Arlington, VA 22202-3604

LEASON ELLIS LLP
Martin B. Schwimmer
Lauren B. Sabol
81 Main Street, Suite 503
White Plains, NY 10601
Tel: (914) 288-0022
LANDO & ANASTASI, LLP
John L. Welch
One Main Street, 11th Floor
Cambridge, MA 02142

s/Robert J. Shaughnessy                    April 16, 2015
_____                    _____
(signature)                                  (date)

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES PRESENTED .................................................2

INTRODUCTION.................................................................................4

STATEMENT OF THE CASE AND FACTS ...........................................6

   I.    BCC Builds FLANAX into the Number-One Brand of Pain
       Relievers in Mexico. .....................................................7

   II.   BCC's Sister Company, BHC, Sells the Popular ALEVE Brand
       of Pain Relievers in the U.S. ...........................................8

   III. Belmora Copies BCC's FLANAX Brand. .........................................8

   IV. Belmora Targets Mexican-American Consumers and
       Distributors with Advertising Suggesting that Belmora's
       FLANAX Medicine is the Mexican FLANAX They Have
       Used "For Generations." .................................................9

   V.    Belmora Successfully Grows Its Business Thanks to BCC's
       Goodwill Among Mexican-American Consumers. ......................11

   VI. Belmora's Misrepresentations Deceive Distributors and
       Consumers....................................................................12

   VII.   BCC Successfully Petitions to Cancel Belmora's FLANAX
       Trademark Registration. ................................................13

   VIII. The District Court Permits Belmora's Deceptive Conduct. .......15

SUMMARY OF ARGUMENT ...............................................................17

STANDARD OF REVIEW....................................................................19

ARGUMENT ........................................................................ 20

I.    BCC Has Stated a Claim for Relief Under Section
      43(a)(1)(A) of the Lanham Act. ................................... 20

   A.    BCC's Substantial Commercial Reputation in its
         FLANAX Mark Is Protectable Under the Lanham Act........... 23

      1.    BCC's FLANAX mark is protectable because a
            substantial segment of the U.S. public associates BCC's
            FLANAX mark with BCC's products, despite BCC's
            lack of sales in the U.S............................................ 24

      2.    BCC's FLANAX mark is protectable because BCC has
            used its FLANAX mark "in commerce," as defined in the
            Lanham Act. ....................................................... 26

      3.    Even if BCC did not own any trademark rights in the term
            FLANAX, BCC has a protectable interest in preventing
            Belmora from misappropriating BCC's commercial
            identity to deceive consumers. .............................. 30

      4.    The Territoriality Principle does not preclude BCC from
            enforcing rights that arise from the substantial goodwill
            of its FLANAX mark among U.S. consumers....................... 34

      5.    The Territoriality Principle is not a license to deceive
            immigrants. ....................................................... 36

   B.    Belmora's Misappropriation of BCC's Commercial Identity
         Has Caused BCC Injuries to Both its Reputation and
         its Sales. ................................................................ 39

      1.    Belmora robbed BCC of its ability to control its own
            commercial reputation and thereby damaged BCC. ............ 40

a) The District Court erred by requiring BCC to plead that Belmora's products were inferior to BCC's to state a claim under the Lanham Act. ................................ 41

b) Nothing in *Lexmark* overruled *Dastar* or *Singer*. ............. 43

2. Belmora has injured BCC by diverting sales at the border, misappropriating BCC's goodwill to compete against its sister company, BHC, and improperly interfering with Bayer's global naproxen sodium marketing strategy ................................................ 44

3. *Lexmark* does not narrow the scope of the Lanham Act. ........................................................ 47

II. Belmora has Used its Registered FLANAX Mark to Misrepresent the Source of its Goods in Violation of Section 14(3) of the Lanham Act ................................. 48

A. The Plain Language of Section 14(3) of the Lanham Act Does Not Require a Party to Own a Trademark to Bring a Petition to Cancel. ................................................... 49

1. None of the cases relied on by the District Court support its contention that there is a use requirement in Section 14(3). ..................................................... 53

B. Section 14(3) Is Consistent with Other Provisions of the Lanham Act Prohibiting Registration of Deceptive Marks.....55

C. *Lexmark* Does Not Alter the Pleading Standard for Petitions for Cancellation. ........................................ 58

D. The Benefits of Federal Trademark Registration do not Extend to Parties Like Belmora who Seek Primarily to Deceive American Consumers. ............................................ 59

III.  BHC Has Adequately Alleged a Claim for False Advertising Under Section 43(a)(1)(B) of the Lanham Act Because, as a Direct Competitor of Belmora, it Suffers Lost Sales from Belmora's Misrepresentations to Consumers............................ 60

IV.  BCC'S Commercial Injuries Caused by Belmora's False Designation of Origin Likewise Apply to BCC's False Advertising Claim. ........................................................................ 61

V.  Bayer's California Claims Should be Reinstated Because the District Court Erroneously Dismissed Bayer's Related Federal Claims. ........................................................................ 62

CONCLUSION ............................................................................. 63

REQUEST FOR ORAL ARGUMENT ................................................... 66

CERTIFICATE OF COMPLIANCE .................................................... 67

CERTIFICATE OF SERVICE ........................................................... 68

# TABLE OF AUTHORITIES

## Cases

*B&B Hardware Inc. v. Hargis Industries, Inc.*,
575 U.S. __, 135 S. Ct. 1293 (2015) .................................................... 59

*Bangor Punta Operations, Inc. v. Universal Marine Co.*,
543 F.2d 1107 (5th Cir. 1976) ........................................................ 45-46

*Barcelona.com, Inc. v. Excelentisimo Ayuntamiento De Barcelona*,
330 F.3d 617 (4th Cir. 2003) ................................................................ 35

*Bayer Consumer Care AG v. Belmora LLC*,
110 USPQ2d 1623 (T.T.A.B. Apr. 17, 2014) ........................................ 54

*Beacon Mutual Ins. Co. v. OneBeacon Ins, Grp.*,
376 F.3d 8 (1st Cir. 2004) ..................................................................... 43

*Big Blue Prods. Inc. v. Int'l Bus. Machines Corp.*,
19 USPQ2d 1072 (T.T.A.B. 1991) ................................................... 24, 35

*Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*,
872 F.2d 1035 (D.C. Cir. 1989) .................................................. 21, 30-33

*Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*,
284 F.3d 302 (1st Cir.2002) .................................................................. 42

*Coca Cola Co. v. Busch*,
44 F.Supp. 405 (D. Pa. 1942) .......................................................... 21, 25

*Corporacion Habanos S.A. v. Anncas Inc.*,
88 USPQ2d 1785 (T.T.A.B. 2008) ........................................................ 56

*Corporacion Habanos SA v. Rodriguez*,
99 USPQ2d 1873 (T.T.A.B. 2011) ........................................................ 57

*Cunningham v. Laser Golf Corp.*,
222 F.3d 943 (Fed. Cir. 2000) .............................................................. 58

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
   539 U.S. 23 (2003) ...................................................................... 23, 33, 43

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
   637 F.3d 435 (4th Cir. 2011) ............................................................ 20

*Edwards v. City of Goldsboro*,
   178 F.3d 231 (4th Cir.1999) ............................................................. 20

*Empresa Cubana del Tabaco v. Culbro Corp.*,
   399 F.3d 462 (2d Cir. 2005) ..........................................................50-51

*Empresa Cubana Del Tabaco v. Gen. Cigar Co.*,
   753 F.3d 1270 (Fed. Cir. 2014) .....................................................50-52

*G. & C. Merriam Co. v. Saalfield*,
   198 F. 369 (6th Cir. 1912) ................................................................. 32

*Genesee Brewing Co. v. Stroh Brewing Co.*,
   124 F.3d 137 (2d Cir. 1997) ..........................................................31-33

*Global Maschinen GmbH v. Global Banking Sys., Inc.*,
   227 USPQ 862 (T.T.A.B.1985) ......................................................... 53

*Gonzales v. Raich*,
   545 U.S. 1 (2005) ................................................................................ 27

*Grupo Gigante SA De CV v. Dallo & Co., Inc.*,
   391 F.3d 1088 (9th Cir. 2004) .......................................................37-38

*Home Builders Ass'n of Greater St. Louis v. L&L Exhibition Mgmt., Inc.*,
   226 F.3d 944 (8th Cir. 2000) ............................................................. 31

*Hornby v. TJX Companies Inc.*,
   87 USPQ2d 1411 (T.T.A.B. 2008) ..................................................... 56

*Int'l. Bancorp, LLC v. Societe des Bains de Mer et du Cercle des
   Estrangers a Monaco*,
   329 F.3d 359 (4th Cir. 2003) .....................................5-6, 27-29, 36-37

*Keene Corp. v. United States*,
    508 U.S. 200 (1993) ............................................................58

*Kellogg Co. v. Nat'l Biscuit Co.*,
    305 U.S. 111 (1938) ........................................................30-31

*King-Seeley Thermos Co. v. Aladdin Indus., Inc.*,
    321 F.2d 577 (2d Cir. 1963) ...............................................32

*Lexmark Int'l Inc. v. Static Control Components, Inc.*,
    134 S. Ct. 1377 (2014) ............................................... passim

*Liquid Controls Corp. v. Liquid Control Corp.*,
    802 F.2d 934 (7th Cir. 1986) .............................................32

*Lone Ranger v. Cox*,
    124 F.2d 650 (4th Cir. 1942) ..........................................33-34

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*,
    507 F.3d 252 (4th Cir. 2007) .............................................43

*M. Kramer Mfg. Co. v. Andrews*,
    783 F.2d 421 (4th Cir. 1986) .......................................25, 28

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*,
    576 F.3d 172 (4th Cir. 2009) .............................................19

*Murphy Door Bed Co. v. Interior Sleep Systems, Inc.*,
    874 F.2d 95 (2d Cir. 1989) ................................................32

*Nat'l Cable Television Ass'n., Inc. v. American Cinema Editors, Inc.*,
    19 USPQ2d 1424 (Fed. Cir. 1991) ..................................24-25

*New York Yankees P'ship v. Evil Ents., Inc.*,
    2013 WL 1305332 (T.T.A.B. Feb. 8, 2013) ......................22, 24

*Nintendo of Am., Inc. v. Aeropower Co.*,
    34 F.3d 246 (4th Cir. 1994) ...........................................27-28

*Osterreichischer Molkerei-und Kasereiverband Registriete GmbH v. Marks & Spencer Ltd.*,
203 USPQ 793 (T.T.A.B.1979) ............................................................. 53

*Otto Int'l Inc. v. Otto Kern GmbH*,
83 USPQ2d 1861 (T.T.A.B.2007) ........................................................ 53

*Pennsylvania State Univ. v. Univ. Orthopedics, Ltd.*,
706 A.2d 863 (Pa. Super. Ct. 1998) ................................................... 32

*People for Ethical Treatment of Animals v. Doughney*,
263 F.3d 359 (4th Cir. 2001) ............................................................. 21

*Person's Co. v. Christman*,
900 F.2d 1565 (Fed. Cir. 1990) .......................................................... 37

*Petróleos Mexicanos v. Intermix SA*,
97 USPQ2d 1403 (T.T.A.B. 2010) ............................................... 38, 55-56

*Priority Auto Grp., Inc. v. Ford Motor Co.*,
757 F.3d 137 (4th Cir. 2014) ...................................................... 19-20

*Ritchie v. Simpson*,
170 F.3d 1092, 1095 (Fed. Cir. 1999) ............................................... 58

*Russello v. United States*,
464 U.S. 16 (1983) ........................................................................... 57

*Singer Mfg. Co. v. June Mfg. Co.*,
163 U.S. 169 (1896) ......................................................................... 30

*Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P.*,
380 F.3d 126 (2d Cir. 2004) ............................................................. 42

*Steele v. Bulova Watch Co.*,
344 U.S. 280 (1952) ................................................................. 25, 27

*TrafficSchool.com, Inc. v. Edriver Inc.*,
653 F.3d 820 (9th Cir. 2011) ........................................................... 64

*Truck Equipment Service Co. v. Fruehauf Corp.*,
536 F.2d 1210 (8th Cir.1976) ........................................................... 42

*United States v. Wong Kim Bo,*
   472 F.2d 720 (5th Cir. 1972) ..................................................57-58

*Willis v. Can't Stop Prods.,*
   497 F. App'x 975 (Fed. Cir. 2012) ........................................54-55

*Yale Elec. Corp. v. Robertson,*
   26 F.2d 972 (2d Cir. 1928) .................................................40, 41

**Statutes**

15 U.S.C. § 1052(a) ...............................................................55-56

15 U.S.C. § 1052(d) ...................................................................57

15 U.S.C. § 1052(e) ...................................................................56

15 U.S.C. § 1064(3) ...............................................................48-49

15 U.S.C. § 1071(b) .....................................................................1

15 U.S.C. § 1114 ........................................................................21

15 U.S.C. § 1121 ..........................................................................1

15 U.S.C. § 1125(a)(1)(A) ......................................................20, 33

15 U.S.C. § 1125(a)(1)(B) .......................................................60-62

15 U.S.C. § 1127 .................................................................5, 27, 60

28 U.S.C. § 1291 ..........................................................................1

28 U.S.C. § 1332 ..........................................................................1

28 U.S.C. § 1338 ..........................................................................1

28 U.S.C. § 1404(a) .....................................................................16

**Treatises**

Restatement Third, Unfair Competition § 15 .........................................32

## Regulations

31 C.F.R. § 515.527 ......................................................................53

# JURISDICTIONAL STATEMENT

The District Court had jurisdiction of the claims by virtue of the fact that: (1) this is an action arising under the Trademark Act of 1946, as amended, 15 U.S.C. §1051 *et seq.* (the Lanham Act), jurisdiction being conferred in accordance with 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a) and (b); (2) this is, in part, an appeal of a Trademark Trial and Appeal Board decision, jurisdiction being conferred in accordance with 15 U.S.C. § 1071(b); and (3) this is a civil action between citizens of different states in which the value of the amount in controversy exceeds $75,000.00, exclusive of interest and costs, jurisdiction being conferred in accordance with 28 U.S.C. § 1332. J.A. 155, 206-07. Appellants filed a timely notice of appeal on March 31, 2015. J.A. 519-20. The Fourth Circuit Court of Appeals has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED

Bayer Consumer Care's FLANAX brand is the number-one pain relief brand in Mexico and has been for decades. The brand is well known to Mexican-American consumers in the United States. As the Trademark Trial and Appeal Board found, Belmora copied Bayer Consumer Care's FLANAX mark and packaging and used deceptive marketing materials in an effort to pass off its products to Mexican-American consumers as the FLANAX medicine those consumers know and trust from Mexico. The questions presented by this appeal are:

1.    Did the District Court err in holding that Bayer Consumer Care is not entitled to protect its commercial and reputational interests in the FLANAX brand in the U.S. from Belmora's intentional misappropriation to deceive U.S. consumers, under Section 43(a)(1)(A) of the Lanham Act?

2.    Did the District Court err in overturning the Trademark Trial and Appeal Board's finding that Belmora's "blatant misuse of the FLANAX mark in a manner calculated to trade in the United States on the reputation and goodwill of [Bayer Consumer Care's FLANAX] mark

created by its use in Mexico" required cancellation of Belmora's trademark registration under Section 14(3) of the Lanham Act?

3.  Did the District Court err in holding that Bayer HealthCare, a direct competitor of Belmora in the United States, could not plausibly allege a commercial injury caused by Belmora's false statements, under Section 43(a)(1)(B) of the Lanham Act?

4.  Did the District Court err in holding that Bayer Consumer Care could not plausibly allege a commercial injury to its sales or its reputation, under Section 43(a)(1)(B) of the Lanham Act, despite Bayer Consumer Care's allegations that (1) it has lost sales of its FLANAX product in the U.S.-Mexico border region as a result of Belmora's misrepresentations; (2) Belmora is using Bayer Consumer Care's goodwill to compete directly with Bayer Consumer Care's sister company, Bayer HealthCare; and (3) Belmora's business strategy improperly interferes with Bayer's global branding strategy for its naproxen sodium products?

# INTRODUCTION

Since the 1970s, Bayer Consumer Care and its predecessors and licensees (collectively, "BCC") have sold naproxen sodium pain relievers in Mexico under the coined trademark FLANAX. Through decades of sales and investment, BCC built its FLANAX brand into the top-selling brand of pain reliever in Mexico. The success of FLANAX in Mexico has earned BCC substantial goodwill in its FLANAX brand among both Mexican consumers and the millions of Mexican-American consumers who have immigrated to the United States since the 1970s.

In 2004, Belmora and its principal, Jamie Belcastro (collectively, "Belmora"), began selling naproxen sodium pain relievers to Mexican-American consumers in the United States under the identical FLANAX trademark. Belmora also copied BCC's FLANAX packaging and targeted customers with marketing materials (often in Spanish) falsely suggesting that Belmora's FLANAX is the FLANAX consumers know and trust from Mexico. Belmora's copying of BCC's well-known FLANAX brand and other deceptive conduct led the Trademark Trial and Appeal Board ("TTAB") to hold that Belmora "blatantly misuse[s] the FLANAX mark in a manner calculated to trade in the United States

4

on the reputation and goodwill" of BCC's FLANAX mark, and therefore to order cancellation of Belmora's FLANAX registration.

Belmora has built a substantial business by willfully and deliberately deceiving Mexican-American consumers into believing that its FLANAX medicine is the same as BCC's FLANAX medicine from Mexico. Belmora competes directly with BCC's American sister company, Bayer HealthCare ("BHC"), maker of the popular ALEVE brand of pain relievers.

The District Court concluded that neither BHC nor BCC (collectively, "Bayer") could allege any injury cognizable under the Lanham Act and therefore dismissed Bayer's complaint and overturned the TTAB decision cancelling Belmora's trademark registration. This ruling was in error.

The District Court's ruling frustrates the Lanham Act's core purposes of "making actionable the deceptive and misleading use of marks in [U.S.] commerce" and "protect[ing] persons engaged in such commerce against unfair competition." 15 U.S.C. § 1127; *see also Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359, 381 (4th Cir. 2003) ("[A]voidance of consumer

confusion is the ultimate end of all trademark law."). The court ignored key precedent in concluding that BCC is not entitled to rely on the Lanham Act to protect its reputation, its goodwill, and its sales from Belmora's blatant, bad-faith passing off. The court also misconstrued core false advertising case law in deciding that BHC, a direct competitor of Belmora, could not plausibly state a commercial injury stemming from Belmora's false advertising.

Ultimately, by allowing Belmora and companies like it to profit from blatant deception of Mexican-American immigrants, the District Court's decision creates a loophole in the Lanham Act that effectively deprives millions of immigrant consumers of the full protections of the Act. This Court should reverse the District Court's ruling and allow Bayer's suit to go forward on the merits.

## STATEMENT OF THE CASE AND FACTS

In the past 40 years, millions of Mexican immigrants have come to this country. This case concerns efforts by one company, Belmora, to profit from these new Americans by selling them a product that Belmora falsely claims is one these consumers know, trust, and prefer

from back home: Bayer Consumer Care's FLANAX brand of pain

relievers.

## I.    BCC Builds FLANAX into the Number-One Brand of Pain Relievers in Mexico.

BCC's FLANAX naproxen sodium pain relief medicine has been

sold in Mexico since the 1970s. J.A. 156, ¶ 9. Over nearly 40 years, BCC

has invested millions of dollars in building its FLANAX brand. J.A. 156,

¶ 12. As a result, the FLANAX brand is extremely well known in

Mexico and to Mexican-Americans in the United States, even though

BCC does not sell its FLANAX products in the United States. J.A. 156,

¶¶ 11-13. Belmora admits as much, acknowledging that "FLANAX is a

very well known medical product in the Latino American market, for

FLANAX is sold successfully in Mexico, Centre [sic] and South

America." J.A. 196 (quoting a sell sheet used by Belmora to solicit

orders from retailers). The TTAB agreed, finding that "the reputation of

the Mexican FLANAX mark does not stop at the Mexican border."

J.A. 191.

## II.    BCC's Sister Company, BHC, Sells the Popular ALEVE Brand of Pain Relievers in the U.S.

BCC has a sister company based in the United States called Bayer HealthCare. J.A. 155, ¶¶ 1-3. BHC markets and sells the well-known ALEVE brand of naproxen sodium pain relievers.[1] J.A. 156, ¶¶ 14-16. Bayer markets its ALEVE and FLANAX brands under a coordinated global marketing strategy based out of BHC's New Jersey office; indeed, the same person within the Bayer family of companies is responsible for the marketing strategy and sales of both brands. J.A. 156, ¶ 17, J.A. 188.

## III.    Belmora Copies BCC's FLANAX Brand.

Nearly thirty years after BCC began using the FLANAX mark for naproxen sodium pain relievers, Belmora applied to register FLANAX in the United States Patent and Trademark Office for "Orally ingestible tablets of Naproxen Sodium for use as an analgesic." J.A. 157, ¶ 18. The mark was registered in 2005, with a claimed first-use date of March 1, 2004. *Id.*

---

[1] The District Court's order says that BHC sells FLANAX. J.A 478. This is incorrect.

8

Although Belmora denied it for many years, Belmora was well aware of BCC's well-known FLANAX brand when it selected the FLANAX mark for its own, essentially identical, product. J.A. 156, ¶ 13; J.A. 159-60, ¶¶30-36; see also J.A. 193-94. In addition to copying BCC's trademark, Belmora adopted packaging nearly identical to BCC's (J.A. 157-60, ¶¶ 22-23):

 

(BCC's FLANAX)            (Belmora's FLANAX)

## IV. Belmora Targets Mexican-American Consumers and Distributors with Advertising Suggesting that Belmora's FLANAX Medicine is the Mexican FLANAX They Have Used "For Generations."

Belmora deliberately associated its FLANAX medicines with Bayer's FLANAX medicines in an effort to deceive Mexican-American

consumers in the United States. For example, in one early marketing piece, Belmora stated:

> Flanax products are made with safe and effective ingredients that have been used for many, many years in Mexico, Central, and South America. And now Belmora LLC is producing them in the United States.

J.A. 159, ¶ 31; J.A. 169-70.[2] At the time Belmora created this marketing piece, it had been selling FLANAX for only two-and-a-half years. J.A. 157, ¶ 18.

In a later piece, distributed to thousands of actual and potential distributors, Belmora described its (then-three-year-old) FLANAX brand as one "that Latinos have turned to" "for generations." J.A. 159-60, ¶ 32; J.A. 171. The piece touted the many selling points of FLANAX, calling it a "highly recognized top-selling brand among Latinos [that] is now made in the U.S." *Id.* According to the brochure, "Flanax acts as a powerful attraction for Latinos by providing them with products they know, trust and prefer. . . With the Flanax family of brands on your

_____

[2] Belmora designated nearly all of the documents produced in the TTAB proceeding as confidential. Bayer accordingly could not reveal the contents of most of these documents in its Complaint. Many of these documents were, however, subsequently de-designated during the parties' summary judgment briefing below.

shelf, Latinos will know where to go to find the brand they trust. Flanax products are packaged with bilingual text and the prominent Flanax logo your customers recognize." *Id.*

To increase sales of its FLANAX products into Hispanic grocery stores, Belmora hired telemarketers to call stores in Hispanic neighborhoods in the U.S. and read a script it had prepared. J.A. 160, ¶ 33. The script described Belmora as "the direct producers of FLANAX in the US," and described FLANAX as "a very well known medical product in the Latino American market, for FLANAX is sold successfully in Mexico, Centr[al] and South America. *Id.*; J.A. 196.

Based on this and other evidence, the TTAB concluded that Belmora "blatant[ly] misuse[d] . . . the FLANAX mark in a manner calculated to trade in the United States on the reputation and goodwill of [BCC's] mark created by [BCC's] use in Mexico." J.A. 192.

## V.    Belmora Successfully Grows Its Business Thanks to BCC's Goodwill Among Mexican-American Consumers.

Belmora's efforts have borne fruit. Belmora initially targeted its marketing towards smaller retailers in predominantly Hispanic communities. J.A. 160, ¶ 35. But by trading off the goodwill of BCC's FLANAX brand, Belmora quickly expanded into major chain retailers

11

such as Wal-Mart, Walgreens, and Circle K. *Id.* Even as its sales grew,

though, Belmora remained focused on targeting Hispanic consumers

who were likely to be familiar with Bayer Consumer Care's well-known

FLANAX analgesics. J.A. 160, ¶¶ 35-36.

Belmora's FLANAX products compete directly with BHC's ALEVE

products. J.A. 157, ¶ 20.

## VI. Belmora's Misrepresentations Deceive Distributors and Consumers.

Numerous distributors, vendors, and even Belmora's own

marketers have been deceived into believing that Belmora's FLANAX

medicine is, or is affiliated with, Bayer Consumer Care's FLANAX

medicine. J.A. 160, ¶ 38. One distributor, for example, wrote to Belmora

explaining its mistaken belief that Belmora was a subdivision of Bayer:

> You are the owner of the Flanax brand as stated on the PT[O]'s registration but consider Bayer owns the brand in many countries and also that you are not just using the name Flanax but their designed in the packaging as well. . . . When we requested the samples, we did not know anything about you and your company's background. We that thought that we were dealing with a subdivision of Bayer that would focus on the Hispanic Market. [*sic*]

J.A. 400. One of Belmora's online retailers, MexGrocer of San Diego,

California, created a web page for Belmora's FLANAX products which

referred to Belmora as "una empresa del grupo BAYER Health Care,"

which translates roughly to "a Bayer Health Care company," and

included a detailed history in Spanish of BCC's FLANAX brand.

J.A. 161, ¶ 39. Still other customers expressed concerns regarding

whether it was "legal to sell [FLANAX] in the US." J.A. 406, 408-12.

Consumers continue to be deceived by Belmora's blatant deceptions.

J.A. 414-16.

## VII. BCC Successfully Petitions to Cancel Belmora's FLANAX Trademark Registration.

In 2007, just over six months after Bayer's counsel first obtained a

sample of Belmora's FLANAX product, BCC petitioned to cancel

Belmora's trademark registration. J.A. 161, ¶ 40; J.A. 421-23. Based on

Belmora's deceptive use of the FLANAX name and copying of Bayer's

FLANAX packaging, BCC alleged that Belmora used the trademark

FLANAX to falsely represent the source of its products as coming from

the same source as the Mexican FLANAX. J.A. 79-83.

Belmora repeatedly sought to obstruct discovery in the TTAB

proceeding. Indeed, the TTAB found that Mr. Belcastro made

"untruthful" statements in his deposition (J.A. 193), "fabricated

evidence" (J.A. 194), and, after the proceedings had been initiated, gave

13

away Belmora's business computer, thereby preventing Bayer "from obtaining any requested documents that resided only on that computer." J.A. 201, n. 83. As a result, most of Belmora's deceptive statements and marketing materials discussed above, as well as the evidence of actual confusion, were not discovered by Bayer until 2010, after the TTAB ordered Belmora to submit its remaining computer to forensic inspection.

In April 2014, after nearly seven years of litigation, the TTAB ordered the cancellation of Belmora's FLANAX trademark registration for misrepresentation of source under Section 14(3) of the Lanham Act. The TTAB noted that, although BCC's claims "present a matter of first impression, they do not present a close case": the evidence before the TTAB "readily establishe[d] [Belmora's] blatant misuse of the FLANAX mark in a manner calculated to trade in the United States on the reputation and goodwill of [BCC's] mark created by its use in Mexico." J.A. 192. The TTAB found that Belmora: "knowingly selected the identical mark FLANAX, used by [BCC's] Mexican licensee on naproxen sodium-based painkillers, for use in the United States on the same type of goods"; "copied [BCC's] FLANAX logo as used in Mexico . . . and other

14

elements of [BCC's] Mexican packaging"; and "repeatedly invoked the reputation of [BCC's] FLANAX mark when marketing [Belmora's] FLANAX product in the United States." J.A. 194-95. The TTAB concluded it had "no doubt that retail customers and consumers exposed to [Belmora's marketing materials] would draw the logical conclusion that [Belmora's] U.S. product is licensed or produced by the source of the same type of product sold under the FLANAX brand for decades south of the border. . . . Nor do we have any doubt based on the record that [Belmora] deliberately and intentionally encouraged its customers to reach such a conclusion." J.A. 196-97.

In sum, the TTAB found that Belmora "built its business on this heritage of misrepresentation, and [BCC] suffers damage today due to [Belmora's] continued use of the identical FLANAX mark on the same type of product." J.A. 201.

## VIII. The District Court Permits Belmora's Deceptive Conduct.

Shortly after the TTAB's ruling, Bayer sued Belmora alleging: (1) unfair competition in violation of Section 43(a)(1)(A) of the Lanham Act, (2) false advertising in violation of Section 43(a)(1)(B) of the Lanham Act; (3) unfair competition in violation of California Business &

15

Professions Code § 17200, *et seq.*; (4) false advertising in violation of

California Business & Professions Code § 17500, *et seq.*; and (5) unfair

competition in violation of California common law. J.A. 154-68. Because

Belmora's business relies on deceiving Mexican-American consumers,

Bayer filed suit in the Central District of California, where Belmora's

target consumers are concentrated, and, consequently, where many of

Bayer's third-party witnesses are located. The California court

transferred Bayer's suit to the Eastern District of Virginia under

28 U.S.C. § 1404(a). Bayer's suit was consolidated with Belmora's

appeal of the TTAB decision, giving rise to the instant suit. J.A. 362.

Belmora moved to dismiss Bayer's claims, and also moved for judgment

on the pleadings on its own appeal of the TTAB's decision. The District

Court granted Belmora's motions, concluding that because BCC did not

sell its FLANAX products in the United States, neither BCC, nor its

sister company BHC, could plausibly allege an injury under Sections

43(a) of 14(3) of the Lanham Act.[3] J.A. 474-517. This appeal followed.

---

[3] BCC filed a counterclaim to Belmora's appeal, which the District
Court also dismissed. BCC does not appeal that dismissal.

16

## SUMMARY OF ARGUMENT

Invoking the Supreme Court's recent decision in *Lexmark Int'l Inc. v. Static Control Components, Inc.*, the District Court held that U.S. law does not protect U.S. consumers from intentional and targeted deceptive trade practices if the trademark that is the linchpin of the deception gained its fame and notoriety outside the U.S., even though that trademark is well known among U.S. consumers. But it is well established that when the public associates a trademark or other term with a plaintiff, that plaintiff may rely on the Lanham Act to prevent bad-faith passing off involving that mark or term, even when the plaintiff does not itself use that mark or term. And it is equally well established that a plaintiff may use the Lanham Act to sue a direct competitor from injuries stemming from that competitor's false advertising. *Lexmark* does not change either of these clear rules. Consequently, *Lexmark* does not bar Bayer's suit: the District Court erred in holding that BCC must sell its FLANAX products in the United States for either BCC or BHC to be able to challenge Belmora's deceptive conduct under the Lanham Act.

17

At its core, the Lanham Act aims to protect consumers from exactly the sort of commercial deception perpetrated by Belmora. It does this by allowing parties like BCC and BHC to protect themselves from commercial injuries to their reputations or sales when those injuries occur through means that are deceptive or confusing. BCC's and BHC's claims both go directly to the heart of the commercial protections afforded by the Lanham Act. By robbing BCC of its ability to control its own reputation, Belmora has caused BCC a reputational injury. Belmora has also caused Bayer injuries in three ways: (1) by diverting sales from BHC, its direct competitor in the U.S., and from BCC in the border region; (2) by trading on BCC's goodwill to compete directly with its sister company, BHC, in the U.S.; and (3) by interfering with Bayer's global naproxen sodium strategy of converting consumers from FLANAX to ALEVE. Belmora's deceptive conduct—targeted at BCC's and BHC's past, present, and potential customers—has injured Bayer, and Bayer is therefore entitled to protect those customers from deception.

This case is about whether Belmora's deceptive practices, committed in the U.S. and aimed at U.S. consumers, are beyond the

reach of the Lanham Act. It is about whether the Lanham Act protects a trademark that Belmora has admitted has a reputation in the U.S. and is recognized by U.S. consumers, or whether the Lanham Act entitles Belmora to capitalize on that reputation to build a business that preys on consumer confusion merely because BCC has not sold products in the U.S. This is also a case about whether Belmora is immune from suit by a direct competitor for false claims Belmora has repeatedly made about the nature of its products. This is not a case about whether foreign trademark rights are enforceable in U.S. courts.

Bayer and its consumers are injured in the United States by Belmora's misrepresentations. The District Court's order dismissing BCC and BHC's claims should therefore be reversed.

## STANDARD OF REVIEW

This Court "review[s] de novo the district court's decision to dismiss under" Rules 12(b)(6) and 12(c). *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009); *see also Priority Auto Grp., Inc. v. Ford Motor Co.*, 757 F.3d 137, 139 (4th Cir. 2014). Motions to dismiss may "only be granted if, 'accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all

reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief.'" *Priority Auto Grp.*, 757 F.3d at 139 (quoting *Edwards v. City of Goldsboro,* 178 F.3d 231, 244 (4th Cir.1999)). In ruling on a motion to dismiss, "a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011).

## ARGUMENT

I.   **BCC Has Stated a Claim for Relief Under Section 43(a)(1)(A) of the Lanham Act.**

Section 43(a)(1)(A) of the Lanham Act prevents consumer deception arising from a defendant's use of a "word, term, name, symbol, or device" or "false designation of origin." 15 U.S.C. §1125(a)(1)(A). Although the statutory language of Section 43(a)(1)(A) never mentions, let alone requires, ownership of a trademark or makes any reference to a potential plaintiff's rights, courts have typically required a plaintiff under this section to prove that it possesses an

interest in a term, mark, or commercial identity.[4] *See People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001);[5] *see also Coca Cola Co. v. Busch*, 44 F.Supp. 405 (D. Pa. 1942); *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1042-45 (D.C. Cir. 1989). Additionally, the plaintiff must show that: the defendant uses the same or similar term, mark, or identity; the defendant's use occurred in commerce; the defendant's use was in connection with the sale, offering for sale, distribution, or advertising of goods or services; and the defendant used the term or mark in a manner likely to confuse consumers. *See People for Ethical Treatment of Animals*, 263 F.3d at 364.

There is no genuine dispute as to any factor in the above-outlined test, other than BCC's allegations concerning its possession of an interest in a term, mark, or commercial identity: Belmora is

---

[4] In contrast, the other basis for bringing suit under the Lanham Act, 15 U.S.C. §1114, explicitly concerns only "a registered mark."

[5] These cases were decided prior to *Lexmark*, in which the Supreme Court emphasized that the Lanham Act must be interpreted, first and foremost, by reading the language of the Act itself. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014) Consequently, it is unclear whether any prior-rights requirement from these cases survives *Lexmark*.

undoubtedly trading on BCC's goodwill in the FLANAX mark to intentionally deceive U.S. consumers. The only question is whether BCC—the maker of the Mexican FLANAX product that consumers believe they are getting when they buy Belmora's product—is the proper party to bring this suit. It is.

BCC's interests in its brand identity are within the zone of interests protected by the Lanham Act. BCC is therefore the proper party to protect that brand identity and to protect Mexican-American consumers from Belmora's commercial deception.

The District Court's order assumed there were three elements that are indispensable to establishing rights under the Lanham Act: (1) use by the plaintiff (2) in the United States (3) of a trademark. J.A. 486-87. To be sure, in the garden-variety trademark case, the party asserting trademark rights would satisfy each of those qualifications. But that does not mean that all of those qualifications are required. Three lines of cases support BCC's position. First, because FLANAX has a substantial reputation among U.S. consumers, following *New York Yankees* and similar cases discussed below, BCC is entitled to protect that reputation even though it has not used the mark in the United

22

States. *See infra* § I.A.1. Second, under the Supreme Court's and this Court's Commerce Clause and Lanham Act jurisprudence, BCC does not need to sell its FLANAX medicine in the U.S. to use the mark "in commerce" under the Lanham Act. *See infra* § I.A.2. Third, BCC does not need to own any U.S. trademark rights in its FLANAX mark because Section 43(a) extends "beyond trademark protection" to prohibit all "unfair trade practices prohibited by its text," including Belmora's deceptive misappropriation of BCC's brand. *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 29 (2003); *See infra* § I.A.3. Each of these lines of cases provides an independent basis for reversing the District Court.

## A.    BCC's Substantial Commercial Reputation in its FLANAX Mark Is Protectable Under the Lanham Act.

The District Court held that BCC cannot plausibly allege *any* protectable interest in its FLANAX trademark and cannot allege *any* injury under the Lanham Act because BCC does not sell its FLANAX medicine in the United States. J.A. 487-89, 493-94. This conclusion is incorrect for two reasons. First, it is well settled that a plaintiff can lay claim to rights in a mark the public associates with the plaintiff, even if the plaintiff itself makes no use of the mark. Second, the District

23

Court's ruling is contrary to Fourth Circuit precedent holding that a trademark can be protectable if it is used in *any* commerce regulable by Congress, not merely commerce taking place within the United States. Because the relevant population of U.S. consumers associates the FLANAX mark with BCC and because BCC has used its FLANAX mark in a manner substantially affecting interstate commerce, BCC has alleged a protectable interest in its FLANAX mark.

1. BCC's FLANAX mark is protectable because a substantial segment of the U.S. public associates BCC's FLANAX mark with BCC's products, despite BCC's lack of sales in the U.S.

"[I]t is well-settled that in order to establish rights in a mark, a party need not have actually used a mark if the public nevertheless associates the mark with the goods or services of that party." *New York Yankees P'ship v. Evil Ents., Inc.*, 2013 WL 1305332, \*4 (T.T.A.B. Feb. 8, 2013).[6] Here, a substantial subset of Americans—not coincidentally,

---

[6] The TTAB is not being hyperbolic in calling this rule "well-settled." *See, e.g., Big Blue Prods. Inc. v. Int'l Bus. Machines Corp.*, 19 USPQ2d 1072, 1074 (T.T.A.B. 1991) ("[E]ven if a company itself has not made use of a term, it may have a protectable property right in the term if the public has come to associate the term with the company or its goods or services.") (internal quotation marks omitted); *Nat'l Cable Television Ass'n., Inc. v. American Cinema Editors, Inc.*, 19 USPQ2d 1424, 1428

the subset of Americans Belmora targets—associates the name
FLANAX with BCC's FLANAX medicines from Mexico. J.A. 156, ¶ 13.
Indeed, Belmora selected the FLANAX mark and copied BCC's
packaging precisely because it knew its target consumers would
recognize both. *See M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 448
(4th Cir. 1986) ("[E]vidence of intentional, direct copying establishes a
prima facie case of secondary meaning sufficient to shift the burden of
persuasion to the defendant on that issue."); J.A. 194-95 (finding
Belmora deliberately copied the FLANAX mark and packaging from
BCC).

But Belmora did not stop there: its entire marketing strategy has
been based on targeting Hispanic consumers and retailers in the U.S.
with materials implying that Belmora's FLANAX products are the

---

(Fed. Cir. 1991) ("[P]ublic use by others inures to the claimant's benefit
and, where this occurs, public use can reasonably be deemed use 'by'
that party in the sense of a use on its behalf."); *Coca Cola Co. v. Busch*,
44 F.Supp. 405 (D. Pa. 1942) (finding that the public's use of "COKE" to
refer to Coca Cola was sufficient to entitle plaintiff to relief from
defendant's use of KOKE-UP for soft drinks, though plaintiff had at
that point not referred to its product as "COKE"); *Steele v. Bulova
Watch Co.*, 344 U.S. 280, 286 (1952) (holding that the sale in Mexico of
infringing goods bearing the BULOVA mark "could well reflect
adversely on Bulova Watch Company's trade reputation in markets
cultivated by advertising here as well as abroad").

25

Mexican FLANAX products consumers have known, trusted, and preferred for generations. J.A. 159-60, ¶¶ 30-37. And so the TTAB concluded that BCC's FLANAX mark has a reputation in this country which BCC is entitled to protect from Belmora's blatant, deceptive copying. J.A. 191. The TTAB's conclusion fits squarely within the well-settled rule that a party is entitled to rely on the Lanham Act to protect its commercial reputation embodied in a trademark, even though it does not itself use that mark. This finding should therefore be affirmed.

>    2.    BCC's FLANAX mark is protectable because BCC has used its FLANAX mark "in commerce," as defined in the Lanham Act.

Even if BCC were required to use its FLANAX mark in U.S. commerce to protect its goodwill in the mark, the District Court's order would still warrant reversal because BCC has used its mark in commerce as defined by the Lanham Act. BCC does not sell its FLANAX products in the United States. But contrary to the District Court's order, this fact is not dispositive.

The District Court, without analysis, found that the Lanham Act's references to "use in commerce" mean use "in commerce in the United States." J.A. 487. But this Court has already held that "commerce"

under the Lanham Act extends to all commerce that Congress may regulate under the Commerce Clause. *See Int'l. Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco,* 329 F.3d 359, 364 (4th Cir. 2003); *see also* 15 U.S.C. § 1127 (defining "commerce" for purposes of the Lanham Act as "all commerce which may lawfully be regulated by Congress"). Thus, in *International Bancorp*, this Court made clear that even if a trademark has only been used for goods or services sold outside the U.S., the mark may still be entitled to protection under the Lanham Act, so long as it is used in some form of regulable commerce. *Id.*

It is well settled that "Congress has the power to regulate activities that substantially affect interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 17 (2005); *see also Steele v. Bulova Watch Co.*, 344 U.S. 280, 285–86 (1952) (holding that the Lanham Act applied to extraterritorial actions because Congress broadly intended to prevent unfair trade practices that affect United States citizens); *Nintendo of Am., Inc. v. Aeropower Co.*, 34 F.3d 246, 250 (4th Cir. 1994) (citing *Steele*) (holding that the Lanham Act empowers courts to enjoin purely

extraterritorial conduct that "ha[s] a significant effect on United States commerce.").

Here, BCC has used its FLANAX mark in regulable commerce because its sales of FLANAX medicine in Mexico have significantly affected interstate commerce by developing a deep reservoir of goodwill in the brand among Mexican-American consumers. BCC thus created the market that Belmora now exploits through its misrepresentations. Belmora effectively admits as much by using marketing materials designed to trade on BCC's substantial U.S. goodwill.[7] This substantial effect on U.S. consumers of BCC's Mexican use of FLANAX brings the mark within the reach of the Lanham Act. BCC's use of FLANAX was "in commerce," and BCC is thus entitled to protect its rights in the U.S

This analysis echoes this Court's ruling in *International Bancorp*. In that case, SBM, like BCC, owned a mark—CASINO DE MONTE CARLO—that was well known in the United States, even though it was used only in connection with products sold abroad. 329 F.3d at 361.

---

[7] To be clear, Belmora's copying of BCC's FLANAX brand does not *give* BCC rights in FLANAX. Instead, BCC's goodwill in the mark within the U.S. is what gives it rights. Belmora's copying is merely *prima facie* evidence that BCC's FLANAX mark acquired goodwill in this country prior to Belmora's copying. *See M. Kramer Mfg. Co.*, 783 F.2d at 448.

SBM, like BCC, sought to enjoin the use of its mark by a defendant who had adopted and used the mark in a bad-faith attempt to deceive consumers. *Id.* There, the infringer, like Belmora, argued that SBM did not own any protectable trademark rights because its products were only sold abroad, specifically, in Monaco. *Id.* at 364-65. This Court rejected that argument, finding that SBM's use of its mark in regulable extraterritorial conduct satisfied the requirements of the Lanham Act. *Id.* at 364.[8]

Like SBM, though BCC has not sold products bearing its trademark here, it has used its mark in commerce regulable by Congress. BCC is thus entitled to protect its rights in the U.S.

---

[8] Thus, although the evidence in that case showed that SBM did not render any services in the United States under the CASINO DE MONTE CARLO mark, "the mark is nonetheless used in commerce because United States citizens purchase casino services sold by a subject of a foreign nation, which purchases constitute trade with a foreign nation that Congress may regulate under the Commerce Clause." *Id.* at 366.

> 3. Even if BCC did not own any trademark rights in the term FLANAX, BCC has a protectable interest in preventing Belmora from misappropriating BCC's commercial identity to deceive consumers.

Even if the District Court were correct that BCC does not own any protectable interest in the trademark FLANAX, BCC could still bring suit under the Lanham Act to stop Belmora's intentional passing off. Indeed, in a string of cases going back more than 100 years, the Supreme Court and several courts of appeal have held that a plaintiff does not need to own trademark rights to be protected from passing off where (1) the public associates a non-trademark term with the plaintiff or its product and (2) defendant is using that term in a bad-faith effort to trade on that reputation. For example, in *Singer Mfg. Co. v. June Mfg. Co.*, the Supreme Court held that the term "Singer" had become generic for a type of sewing machine, but nevertheless required that the defendant not use the term on its product or in advertisements "without clearly and unmistakably stating . . . that the machines are made by the defendant, as distinguished from the sewing machines made by the Singer Manufacturing Company." 163 U.S. 169, 204 (1896). The Supreme Court applied the same principle in *Kellogg Co. v. Nat'l Biscuit Co.*, holding that the term "shredded wheat" was generic and

therefore unprotectable, but that defendant had to "use reasonable care to inform the public of the source of its product." 305 U.S. 111, 119 (1938).

Ever since *Singer* and *Kellogg*, this approach has been a mainstay of U.S. unfair competition law. For instance, in *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, the D.C. Circuit found that "Blinded veterans' is a generic term; BVA's name and logo therefore are not entitled to trademark protection." 872 F.2d 1035, 1048 (D.C. Cir. 1989). Nevertheless, the court held that "BVA may be entitled to protection against passing off, however[, i]f the district court determines that people will likely think that BAVF *is* BVA." *Id.*[9] As now-Justice

---

[9] Similarly, in *Home Builders Ass'n of Greater St. Louis v. L&L Exhibition Mgmt., Inc.*, the Eighth Circuit "reject[ed defendant's] contention that a functional trade dress, or a generic trademark, is entitled to *no* protection from unfair competition under § 43(a). . . . A generic trademark or functional trade dress is not protected from copying. But if it has acquired secondary meaning, § 43(a) relief may be appropriate to require the copier to take reasonable measures to eliminate public confusion as to the source of its competing product or service." 226 F.3d 944, 950 (8th Cir. 2000) (emphasis in original). *See also Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 151 (2d Cir. 1997) (holding that although term "honey brown ale" is generic, plaintiff, "may be granted an injunctive remedy that, while allowing [defendant] to continue to market its beer and sell it[s beer] as a 'honey brown ale,' would require [defendant] to make more of an effort to

Ginsburg noted, a defendant can exacerbate this likelihood of deception stemming from its use of a non-trademark term, and thereby give rise to a claim for passing off, "by, for example, using a similar label, similar packaging, misleading advertisements, or simply by failing to state the product's source." *Id.* at 1045. BCC has alleged, and the TTAB record shows, that this is exactly what Belmora has done. Taken together, BCC's reputation in the FLANAX mark, plus Belmora's bad-faith attempt to trade off that reputation to deceive consumers, give BCC the right to stop Belmora's deceptive conduct.

---

ensure that its product is not confused with [plaintiff's]"); *Murphy Door Bed Co. v. Interior Sleep Systems, Inc.*, 874 F.2d 95, 102 (2d Cir. 1989) ("Because the term Murphy bed is generic, [defendant] did not engage in unfair competition by selling and advertising his products as Murphy beds; [defendant] did engage in unfair competition, however, by passing off products of his own manufacture as Murphy Co. products."); *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 939 (7th Cir. 1986); *King-Seeley Thermos Co. v. Aladdin Indus., Inc.*, 321 F.2d 577, 581 (2d Cir. 1963); *G. & C. Merriam Co. v. Saalfield*, 198 F. 369, 373 (6th Cir. 1912); *Pennsylvania State Univ. v. Univ. Orthopedics, Ltd.*, 706 A.2d 863, 869 (Pa. Super. Ct. 1998) (holding that Pennsylvania State University had sufficiently pled passing off where it alleged that defendant used the generic term "university" to imply a connection with Penn State); Restatement Third, Unfair Competition § 15, comment d (1995) ("Use of a generic term in a manner likely to deceive or mislead a significant number of prospective purchasers as to the source of the goods or service, however, may subject the user to liability under the general rule proscribing misrepresentations of source.").

The *Singer* line of cases represents a specific application of a general principle: the Lanham Act, and specifically Section 43(a)(1)(A), "goes beyond trademark protection" to regulate "certain unfair trade practices prohibited by its text."[10] *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 29 (2003). The text of Section 43(a)(1)(A) prohibits any party from "us[ing] in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." While BCC's case may not be "precisely similar to that kind of unfair competition involving . . . the unfair use of trademarks and trade names, the principle involved is the same as that recognized in these cases, viz., that a court of equity should enjoin any form of

_____

[10] Although *Singer* was decided before the Lanham Act was passed, the *Singer* rule applies to Lanham Act cases. *See, e.g.*, *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035 (D.C. Cir. 1989); *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137 (2d Cir. 1997).

passing off which involves fraudulent appropriation, through devices calculated to deceive or mislead the public, of the business or good will which another has built up." *Lone Ranger v. Cox*, 124 F.2d 650, 652-53 (4th Cir. 1942) (internal quotation marks omitted). Belmora has misappropriated BCC's FLANAX brand, causing confusion, mistake, and deception among the many consumers who believe that Belmora's FLANAX is related to (i.e., the same as) BCC's FLANAX. Belmora's use of FLANAX is thus prohibited by the Act, irrespective of whether BCC owns trademark rights. The District Court's decision categorically requiring a party to use a trademark to bring a suit under the Lanham Act (J.A. 487) simply cannot be squared with the Supreme Court's holdings in *Dastar* and *Singer*, and the many lower-court cases applying those decisions.

> 4. The Territoriality Principle does not preclude BCC from enforcing rights that arise from the substantial goodwill of its FLANAX mark among U.S. consumers.

Throughout these proceedings, Belmora has argued that the Territoriality Principle categorically precludes BCC from acquiring any rights in its FLANAX mark unless BCC uses the mark in the United States. This argument is based on a fundamental misunderstanding of

the Territoriality Principle. The Territoriality Principle is the principle that, "a mark exists only under the laws of each sovereign nation." *Barcelona.com, Inc. v. Excelentisimo Ayuntamiento De Barcelona*, 330 F.3d 617, 628 (4th Cir. 2003) (citation and quotation marks omitted). In other words, the Territoriality Principle provides that whether a party has rights in a country is determined by the laws of that country. Thus, to determine whether a party from Country Y owns trademark rights in Country X, courts apply the law of Country X—the party's rights in Country Y do not grant rights in Country X. Some countries require a registration to establish rights. In those countries, a party must register its mark domestically to obtain rights. The United States, by contrast, does not require registration. Instead, to establish rights in the United States, a party must use a term in commerce (defined broadly) or "if a company itself has not made use of a term, it may have a protectable property right in the term if the public has come to associate the term with the company or its goods or services." *Big Blue Prods. Inc. v. Int'l Bus. Machines Corp.*, 19 USPQ2d 1072, 1074 (T.T.A.B. 1991). And even if a party does not own trademark rights, it can still bring a claim for

passing off where the defendant has misappropriated plaintiff's identity to deceive consumers. *See supra*, § I.A.3.

BCC is not seeking to assert its Mexican trademark rights here. Rather, as explained above, BCC has established rights under U.S. law. Contrary to Belmora's argument, the Territoriality Principle does not destroy those rights—it merely defines whose law must be referred to when determining that those rights exist. Because BCC's rights arise under U.S. law, its claims fit squarely within the Territoriality Principle.

     5.    The Territoriality Principle is not a license to deceive immigrants.

Belmora apparently believes it has found a loophole in the Lanham Act—based on the Territoriality Principle—that allows it to deceive U.S. consumers with impunity. This is not so. "[A]voidance of consumer confusion is the ultimate end of all trademark law." *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359, 381 (4th Cir. 2003). Consumers and distributors have been deceived by Belmora's attempts to pass its medicine off as BCC's well-known FLANAX medicine. J.A. 160-61, ¶¶ 38-39. BCC brought this suit to stop Belmora's deceptive conduct. Misreading the

Territoriality Principle to bar BCC's claims would undermine the purpose of the Lanham Act and strip millions of immigrants of the full protection of the law:

> Commerce crosses borders. In this nation of immigrants, so do people. . . . There can be no justification for using trademark law to fool immigrants into thinking that they are buying [the product] they liked back home.

*Grupo Gigante SA De CV v. Dallo & Co., Inc.*, 391 F.3d 1088, 1094 (9th Cir. 2004); *see also Int'l Bancorp*, 329 F.3d at 381-82 (noting "the very real interest that our trademark laws have in minimizing consumer confusion" and concluding that "trademarks developed overseas can themselves lead to such undesirable and inefficient consumer confusion here at home"). Where, as here, a substantial population of U.S. consumers knows and trusts a brand from its home country, and another party uses that mark to deliberately deceive those consumers, the Territoriality Principle does not apply to frustrate the central premise of the Lanham Act. *Grupo Gigante*, 391 F.3d at 1098; *see also Person's Co. v. Christman*, 900 F.2d 1565, 1570 (Fed. Cir. 1990) (noting cases finding bad faith sufficient to defeat a U.S. user's claim of trademark rights as against a prior foreign mark owner "where . . . the foreign mark is famous here").

37

The District Court's opinion has potentially drastic consequences for American consumers, and particularly for one of the fastest-growing segments of American consumers, Mexican immigrants. What if an unscrupulous Cayman Islands company sought to register the house mark of Mexico's state-owned petroleum company, a ubiquitous mark in Mexico owned by one of the largest corporations in the world, but a mark that the rightful owner does not use in the U.S? Or what if a San Diego-based grocery store adopted the same name as a massive Mexican chain, one that had multiple locations just outside of San Diego in Tijuana? In either of these cases, many U.S. consumers would undoubtedly be deceived by the copied trademarks and engage in commerce thinking that they were dealing with a company that they had known and trusted for years. But under the District Court's reasoning, the original trademark owner—and, more importantly, consumers—would be out of luck. Fortunately, the premises of the District Court's reasoning have been rejected in each of these actual cases. *See Petróleos Mexicanos v. Intermix SA*, 97 USPQ2d 1403, 1405 (T.T.A.B. 2010); *Grupo Gigante*, 391 F.3d at 1094. Just as they should be here.

B.    Belmora's Misappropriation of BCC's Commercial Identity
      Has Caused BCC Injuries to Both its Reputation and its
      Sales.

Based on its erroneous conclusion that BCC did not own any

protectable interest in its substantial U.S. goodwill, the District Court

concluded that BCC is not entitled to the protections of the Lanham

Act, and neither are consumers familiar with its products. J.A. 488-94.

The Court's decision then compounded that error by holding that BCC

did not allege any injuries cognizable under the Lanham Act. As the

Supreme Court recently made clear in its *Lexmark* decision, though,

Section 43 of the Lanham Act applies broadly to provide relief from any

commercial injuries—either to sales or to reputations—that can fairly

be traced to defendant's false statements about its products. *Lexmark*

*Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390

(2014). Thus a plausible allegation of injury to either reputation or sales

is sufficient to state a claim under Section 43. Here, BCC has alleged

both. It has alleged that Belmora's conduct stripped BCC of control of

its own reputation, and BCC has alleged that Belmora's conduct has

improperly interfered with BCC's global business strategy and caused

BCC lost sales at the border. The District Court's attempts to minimize

these allegations makes them no less true or plausible.

      1.    **Belmora robbed BCC of its ability to control its own commercial reputation and thereby damaged BCC.**

By trading on BCC's reputation to deceive consumers, Belmora

has robbed BCC of its ability to control its own reputation. J.A. 191.

Mexican-American consumers seeing Belmora's FLANAX on store

shelves naturally assume it is BCC's FLANAX.  Thus, Belmora has

taken BCC's reputation out of BCC's hands. As the District Court

acknowledged, this loss of a party's ability to control its own reputation

is a paradigmatic Lanham Act injury. J.A. 492-93 (citing *Yale Elec.*

*Corp. v. Robertson*, 26 F.2d 972, 974 (2d Cir. 1928)).

Nonetheless, the District Court concluded that because BCC does

not own any trademark rights in its FLANAX mark, its interests do not

fall within the zone of interests protected by Section 43(a) of the

Lanham Act. J.A. 485. But for all the reasons detailed above, the

District Court's conclusion is in error. BCC owns protectable rights in

the United States in its FLANAX mark—or is, at a minimum, entitled

under the *Singer* line of cases to put an end to Belmora's passing off.

Therefore, BCC's claim is within the zone of interests protected under Section 43(a).

> a) The District Court erred by requiring BCC to plead that Belmora's products were inferior to BCC's to state a claim under the Lanham Act.

One of the Lanham Act's central concerns is enabling merchants to control their own reputations. As Judge Learned Hand stated in underscoring the singular importance of a reputation to its owner,

> [a merchant's] mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mark.

*Yale Elec.*, 26 F.2d at 974. Thus, pleading an injury under Section 43(a)(1)(A) of the Lanham Act does not require a plaintiff to plead that its reputation has become tarnished, but merely that its reputation has been wrested from its control. *See id.*

But the District Court cast aside this well-settled rule, calling it "inapplicable" because it believed that BCC does not own any trademark rights. J.A. 493. Instead, the District Court applied a heightened standard to BCC's claims, holding that BCC could not

plausibly allege any injury to its commercial reputation unless it alleged that Belmora's FLANAX products had caused actual harm to BCC's reputation. J.A. 491-92.

The court's ruling is erroneous because the Lanham Act's reputational-control interests apply to *all* claims brought under the Lanham Act's false designation of origin provision (i.e., Section 43(a)(1)(A)), not merely those styled as "trademark infringement" actions.[11] *See Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d 1210 (8th Cir.1976) (holding that defendant violated the predecessor of 43(a)(1)(A) by using plaintiff's photographs in defendant's sales literature even though the defendant's products were of equal quality as the plaintiff's); *Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P.*, 380 F.3d 126, 131-32 (2d Cir. 2004) (finding that allegations of consumer confusion were sufficient to state a claim for reverse passing off under Section 43(a)(1)(A) where defendant claimed to manage hotels that were actually managed by plaintiff). So even if

---

[11] As discussed above, though, BCC does own protectable rights in its FLANAX mark. So even were it true that the Lanham Act's foundational reputational interests applied only to quote-unquote "trademark infringement" suits, the District Court's heightened burden would not apply here.

the District Court were correct that BCC owned no rights in its

FLANAX trademark, BCC would still not be required to plead that

Belmora's product had actually tarnished BCC's reputation to be able to

protect its substantial U.S. reputation.[12],[13]

   b)    Nothing in *Lexmark* overruled *Dastar* or *Singer*.

   As discussed above, both *Dastar* and the *Singer* line of cases

stand for the principle that a party need not own or use a trademark to

---

[12] The court's opinion reaches the opposite conclusion through an erroneous negative inference. Because, the court reasons, "the 'quality control' injury is typically actionable as a trademark infringement claim," it therefore concludes that this type of injury is not actionable in cases not styled as "trademark infringement." Op., p. 20. But just as Section 43(a)(1)(A) extends "beyond trademark protection," so do the reputational interests it is designed to protect. *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 29 (2003).

[13] There is yet another problem with the District Court's heightened 'actual harm' standard: under the Lanham Act, a party need only prove likely harm, not actual harm. *See Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 311 (1st Cir.2002) (holding that "a showing that the defendant's activities are likely to cause confusion or to deceive customers is sufficient to warrant injunctive relief"). The District Court's opinion, however, required BCC to allege actual harm "analogous to the 'choking dog' referenced in *[Louis Vuitton Malletier S.A. v.] Haute Diggity Dog[, LLC*, 507 F.3d 252 (4th Cir. 2007)] , or the evidence of misdirected premium payments and claims forms presented in *Beacon Mutual [Ins. Co. v. OneBeacon Ins, Grp.*, 376 F.3d 8 (1st Cir. 2004)]." Op., p. 19. This supposed requirement that BCC plead actual harm to its reputation—instead of merely likely harm—impermissibly heightened the pleading standard for BCC's claims, in violation of *Lexmark.*

bring a claim under Section 43(a)(1)(A). Nothing in *Lexmark* overrules any aspect of these cases. But the District Court ignores these principles, finding that, under *Lexmark*, Section 43(a)(1)(A) only protects trademark users. Because the District Court's reading of *Lexmark* is inconsistent with the Supreme Court's prior cases, it should be rejected.

Ultimately, BCC has plausibly alleged (and, before the TTAB, proven) an injury to its commercial reputation caused directly by Belmora's deceptive use of the FLANAX mark. BCC's claims should not have been dismissed.

      2.    Belmora has injured BCC by diverting sales at the border, misappropriating BCC's goodwill to compete against its sister company, BHC, and improperly interfering with Bayer's global naproxen sodium marketing strategy.

BCC's injuries go beyond mere loss of reputational control. BCC—as part of the Bayer group of companies—also suffers financially as a result of Belmora's deception.

BCC has suffered lost sales from U.S- and Mexico-based consumers who regularly traverse the border, buying products on either side. Belmora sells its FLANAX products in "geographic areas with high

Mexican-American populations," including locations on the U.S.-Mexico border. J.A. 159, ¶ 29. BCC has invested in substantial advertising and made substantial sales of its FLANAX products in border cities. J.A. 156, ¶¶ 11-12. This geographical overlap, paired with Belmora's misrepresentations, has diverted sales from BCC to Belmora because consumers who would otherwise buy FLANAX in Mexico can simply buy "it" in the U.S. instead, thinking the products are identical.

Further, BCC's affiliate and co-plaintiff—BHC—sells pain relievers containing the same active ingredient as the FLANAX product under a different mark—ALEVE—here in the United States. The same person in the Bayer family of companies is responsible for the marketing strategy for both FLANAX and ALEVE products. Belmora obtained and is using its FLANAX registration in the United States to deceive U.S. consumers familiar with BCC's Mexican FLANAX medicine. In so doing, Belmora is using the substantial goodwill of the FLANAX brand among U.S. consumers to piggyback off of decades of investment in the Mexican FLANAX brand and to unfairly compete with BHC's ALEVE products in the United States. *See Bangor Punta Operations, Inc. v. Universal Marine Co.*, 543 F.2d 1107, 1109 (5th Cir.

45

1976) ("[M]isappropriation of advertising material constitutes a federal tort of unfair competition in violation of [§] 43(a) of the Lanham Act.").

Bayer has made a conscious business decision not to compete against itself by offering its FLANAX medicine in the United States. By selling knockoff FLANAX products to U.S. consumers familiar with Bayer's FLANAX products, Belmora has improperly interfered with Bayer's ability to convert its immigrating customers from one leading Bayer brand—FLANAX—to another—ALEVE. Instead, U.S. consumers who see the familiar FLANAX brand will assume that it is the same product from the same source as what they know and trust from Mexico, and therefore buy Belmora's product, rather than the ALEVE product.

The District Court's order calls these injuries—diverted sales from BCC's sister company to its direct competitor caused by Belmora's deception of consumers—"speculative." J.A. 490. The order does not explain how these damages are speculative, let alone too speculative to survive a motion to dismiss. Belmora has willfully arrogated BCC's commercial identity as its own, reaping the benefits of BCC's substantial investment in the FLANAX brand. By doing so, Belmora

46

has used that identity to compete against BHC's ALEVE products. As a result of Belmora's misappropriation, consumers are buying Belmora's FLANAX instead of BCC's FLANAX (in Mexico) or ALEVE (in the U.S.). This is not speculative—this is what Belmora intended and this is what is actually happening in the marketplace.[14]

Because BCC has pled injuries to its commercial interests in the U.S. and abroad with respect to both reputation and sales as a result of Belmora's pattern of misrepresentations, BCC has stated a claim under Section 43(a)(1)(A) of the Lanham Act.

       3.    *Lexmark* does not narrow the scope of the Lanham Act.

After losing repeated challenges to BCC's standing in the TTAB, Belmora has now seized on *Lexmark* as the magic bullet that will allow it to continue its deceptive scheme. But *Lexmark* will not save Belmora. *Lexmark* does not narrow the scope of permissible Lanham Act claims, and the same factual findings that underpinned the TTAB's (pre-*Lexmark*) cancellation decision similarly satisfy the Supreme Court's *Lexmark* analysis.

---

[14] To the extent that the District Court doubted that consumers who purchased FLANAX in the U.S. would otherwise have purchased ALEVE, that is an issue of fact inappropriate for resolution on the pleadings.

What *Lexmark* holds is that to bring a claim for false advertising under the Lanham Act, a party must allege a commercial injury to reputation and/or sales that was proximately caused by the defendant's acts. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014). It did not heighten the pleading standard for a Lanham Act claim. Indeed, *Lexmark* holds just the opposite: it eliminated one judge-made hurdle to pleading—so-called "prudential standing"—and forbade courts from reading additional requirements into Lanham Act claims beyond those written into the text itself or incorporated via the common law. *Id.* at 1388 (warning that a court "cannot limit a cause of action that Congress has created merely because 'prudence' dictates.") Here, BCC has alleged injuries to both its reputation and its sales caused by Belmora's usurpation of its goodwill. These injuries bring BCC's claim squarely within *Lexmark* and the Lanham Act.

## II.  Belmora has Used its Registered FLANAX Mark to Misrepresent the Source of its Goods in Violation of Section 14(3) of the Lanham Act.

Section 14(3) of the Lanham Act grants a right to cancel a trademark registration to "any person who believes that he is or will be

damaged . . . by the registration of a mark on the principal register . . . At any time . . . if the registered mark is being used by, or with the permission of, the registrant so as to misrepresent the source of the goods or services on or in connection with which the mark is used." 15 U.S.C. § 1064(3). The TTAB, with the benefit of a full record, concluded that Belmora "built its business on [a] heritage of misrepresentation, and [BCC] suffers damage today due to [Belmora's] continued use of the identical FLANAX mark on the same type of product." J.A. 201. The District Court erred in overturning the TTAB decision cancelling Belmora's FLANAX registration under Section 14(3) of the Lanham Act because the court read a use requirement into the section that is simply not there.

## A. The Plain Language of Section 14(3) of the Lanham Act Does Not Require a Party to Own a Trademark to Bring a Petition to Cancel.

By its terms, Section 14(3) does not require that a party use a mark in the United States to bring an action for cancellation. Instead, it grants a cause of action to "any person who believes that he is or will be damaged" by the registration, not merely a party with prior rights in a similar mark. As the actual owner of the Mexican FLANAX product

49

Belmora pretends to sell, BCC has, at a minimum, a reasonable belief that it has been and will continue to be damaged by Belmora's registration for its deceptive mark.

The case law is—or, until the District Court's order, was—clear that a party need not use a mark in the U.S. to challenge another party's deceptive registration of that mark. Indeed, the Federal Circuit recently held that "[i]n [trademark cancellation] proceedings before the Board," a petitioner "*need not own the mark* to cancel the Registrations under [Section 14(3)]." *Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 1278 (Fed. Cir. 2014) (emphasis added). In that case, the petitioner, Cubatabaco, owned the COHIBA mark for cigars, which was well known in the United States. *Id.* at 1272. However, the Cuban embargo prevented Cubatabaco from selling its product—and thus using its COHIBA mark—in the United States. *Id.* Seizing the opportunity to exploit Cubatabaco's goodwill in the United States, General Cigar registered and used the COHIBA mark in the United States for cigars. *Id.* at 1271-72; *Empresa Cubana del Tabaco v. Culbro Corp.*, 399 F.3d 462, 464-66 (2d Cir. 2005). Cubatabaco sought to cancel General Cigar's registration under Section 14(3), among other grounds,

and the Federal Circuit held that Cubatabaco could bring its Section 14(3) claim even though the Cuban embargo legally forbade Cubatabaco from owning the mark in the U.S. and had prevented it in the past, and would prevent it in the foreseeable future, from selling any goods in the U.S. under the COHIBA mark. *See Empresa Cubana*, 753 F.3d at 1278; *Empresa Cubana*, 399 F.3d at 464.

The District Court disregarded *Empresa Cubana* on the ground that the petitioner in that case was subject to a regulation which specifically granted it standing. J.A. 511. The court's reasoning ignores the complex procedural posture of the case, and consequently misconstrues the Federal Circuit's conclusion that prior trademark rights are not an element of a Section 14(3) cause of action.

The *Empresa Cubana* case involved two parallel disputes—one in federal court and one in the TTAB. In the federal court proceeding, the Second Circuit concluded that Cubatabaco could not acquire prior rights in the COHIBA mark because of the Cuban embargo. *Empresa Cubana*, 399 F.3d at 474-46, 481.

Following the Second Circuit's decision, General Cigar sought to dismiss Cubatabaco's cancellation petition in the TTAB. The TTAB

51

granted that request, but the Federal Circuit overruled the TTAB. Among several issues before the Federal Circuit was whether the Second Circuit's ruling precluding Cubatabaco from claiming prior rights in its COHIBA mark precluded Cubatabaco from bringing a petition under Section 14(3). 753 F.3d at 1278. Of course, if prior ownership of a mark were an element under Section 14(3), then the Second Circuit's ruling would indeed have precluded Cubatabaco's Section 14(3) claim. But the Federal Circuit held that the Second Circuit's ruling did not preclude Cubatabaco's Section 14(3) claim because Cubatabaco's Section 14(3) claim, unlike its Second Circuit claims, did not require Cubatabaco to own any prior rights in a trademark to bring a petition to for cancellation. *Id.* (holding that "[c]laim preclusion does not bar Cubatabaco's" petition to cancel under Section 14(3) because "the transactional facts involved in the Second Circuit decision differ from those in the cancellation proceedings before the Board" because "[i]n the proceedings before the [TTAB] . . . Cubatabaco need not own the mark to cancel the Registrations under 15 U.S.C. § 1064.").[15]

---

[15] Contrary to the District Court's interpretation (J.A. 511), the Federal

Or to put it in *Lexmark* terms, Cubatabaco prevailed on its

Federal Circuit appeal because prior trademark rights are not "an

element of the cause of action under" Section 14(3), and therefore need

not be alleged to state a claim. *Lexmark*, 134 S. Ct. at 1391, n. 6. Thus,

even if this Court were to conclude that BCC has no rights in its

FLANAX mark that fact would still not preclude BCC from bringing a

petition for cancellation for misrepresentation of source under Section

14(3).

> 1.    None of the cases relied on by the District Court
>        support its contention that there is a use requirement
>        in Section 14(3).

As already discussed, there is no use requirement within the text

of Section 14(3). Nonetheless, the District Court's opinion tries to

construct one by looking at three cases cited by the TTAB

> in defining the rule for misrepresentation of source: (1) *Otto Int'l Inc. v. Otto Kern GmbH*, 83 U.S.P.Q.2d 1861, 1863, 2007 WL 1577524, at *3 (T.T.A.B. 2007); (2) *Global Maschinen GmbH v. Global Banking Sys., Inc.*, 227 U.S.P.Q. 862, 864 n. 3, 1985 WL 71943, at *2 n. 3 (T.T.A.B. 1985); and (3) *Osterreichischer Molkerei-und Kasereiverband Registriete GmbH v. Marks & Spencer Ltd.*, 203 U.S.P.Q. 793, 794, 1979 WL 25355, at *1 (T.T.A.B. 1979).

---

Circuit's holding with respect to claim preclusion—and, *a fortiori*, of the elements of Section 14(3)—did not turn on 31 C.F.R. § 515.527.

J.A. 510. The opinion concluded that because "[o]wnership rights in a mark were present in two of the cases," ownership of a mark must therefore be a requirement under Section 14(3). *Id.*

The flaw in the District Court's reasoning is that it converts the facts of three particular cases into a rule for all future cases. But *none* of the cases cited by the District Court turned on the question of petitioner's use of a mark.[16] These cases do not stand for the proposition that use is always required under Section 14(3) any more than the fact of 44 consecutive male Presidents stands for the proposition that maleness is a constitutional requirement to be President. The District Court's reliance on these cases as the source of a use requirement is misplaced.[17]

_____

[16] The premise of the District Court's reasoning seems to be that the TTAB's interpretation of the scope of Section 14(3) carries weight. But of course, in reviewing TTAB case law interpreting the requirements of Section 14(3), the District Court gave no weight to the TTAB's holding in its most recent, precedential opinion on this very issue: *Bayer Consumer Care AG v. Belmora LLC*, 110 USPQ2d 1623 (T.T.A.B. Apr. 17, 2014).

[17] The District Court's reliance on *Willis v. Can't Stop Prods.* is similarly misplaced. J.A. 508. That case turned on whether the mark VILLAGE PEOPLE was owned by the band as a whole or by Victor Willis, the lead singer/cop, individually. 497 F. App'x 975, 976 (Fed. Cir. 2012). There, the court held that because Mr. Willis had repeatedly

54

BCC's suit may be different from typical cases under Section 14(3) or 43(a), but that does not make it statutorily defective. As the TTAB found, although BCC's claims "present a matter of first impression, they do not present a close case." J.A. 192. Belmora's conduct violates the plain language of Section 14(3), and BCC is entitled to bring this claim.

### B. Section 14(3) Is Consistent with Other Provisions of the Lanham Act Prohibiting Registration of Deceptive Marks.

The TTAB's holding that BCC stated (and proved) a claim under Section 14(3) was consistent with case law interpreting other provisions of the Lanham Act prohibiting the registration of deceptive trademarks. The TTAB has repeatedly held that a petitioner's use of a mark in the United States is not an element of a proceeding brought under Sections 2(a) and 2(e) of the Lanham Act.[18] *See, e.g., Petróleos Mexicanos v.*

---

acknowledged the group's rightful ownership of the mark, his wife could not state a claim for misrepresentation of source on the ground that Mr. Willis was the true source of the VILLAGE PEOPLE musical performances. *Id.* at 978.

[18] Section 2(a) provides:

No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it—

(a) Consists of or comprises immoral, deceptive, or scandalous matter; or matter which may disparage or falsely suggest a

55

*Intermix SA*, 97 USPQ2d 1403, 1405 (T.T.A.B. 2010) (holding that the owner of the famous PEMEX brand in Mexico did not need to allege rights in the U.S. to bring a Section 2(a) challenge against an application for PEMEX); *Hornby v. TJX Companies Inc.*, 87 USPQ2d 1411 (T.T.A.B. 2008) (holding that a petitioner that had abandoned use in the United States of her personal name mark could prevail on a claim of false suggestion of a connection under Section 2(a) due to the reputation of petitioner within the United States); *Corporacion Habanos S.A. v. Anncas Inc.*, 88 USPQ2d 1785, 1790 (T.T.A.B. 2008) (rejecting argument that petitioner, whose Cuban cigars could not be sold in the United States due to a trade embargo, lacked standing to challenge a mark as geographically misdescriptive under Section 2(e), saying "So as to be perfectly clear, opposer has standing, although it does not and cannot engage in any business in the United States due to the embargo

---

connection with persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute; or a geographical indication which, when used on or in connection with wines or spirits, identifies a place other than the origin of the goods . . .
15 U.S.C. § 1052(a). Section 2(e) extends this prohibition to, *inter alia*, marks which are "deceptively misdescriptive" and "primarily geographically deceptively misdescriptive." 15 U.S.C. §§ 1052(e)(1), (3).

on Cuban goods."). Simply put, "there is no requirement for [a] petitioner to establish a property interest as that is not an element required for standing under Sections 2(a) or 2(e)(3)." *Corporacion Habanos SA v. Rodriguez*, 99 USPQ2d 1873, 1875 (T.T.A.B. 2011). Nor is it under Section 14(3).

Sections 2(a), 2(e), and 14(3) of the Lanham Act stand in sharp contrast to Section 2(d). Section 2(d) explicitly requires a petitioner to own prior rights in the United States to pursue a cancellation action. *See* 15 U.S.C. § 1052(d).[19] So while Congress made use of a mark by the challenger a prerequisite for some bases, like Section 2(d), it did not for others, like Sections 2(a), 2(e), and 14(3). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States*

---

[19] Section 2(d) prohibits registration of "a mark which so resembles a *mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned*, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive.") (emphasis added).

*v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir. 1972)); *see also Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (differing language between statutory provisions "underscores our duty to refrain from reading a phrase into the statute when Congress has left it out."). The District Court's conclusion that Section 14(3) required trademark use by BCC was therefore erroneous.

### C. *Lexmark* Does Not Alter the Pleading Standard for Petitions for Cancellation.

Contrary to the District Court's reasoning, *Lexmark* does not add a use requirement for a petitioner to have standing under Section 14(3). J.A. 507, 510. *Lexmark* does not alter the pleading standard for bringing a petition for cancellation. "Standing . . . requires only that the party seeking cancellation believe that it is likely to be damaged by the registration." *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 945 (Fed. Cir. 2000)). Applying the *Lexmark* framework to this standard, BCC thus needs to allege only a reasonable belief that it will suffer or has suffered a reputational or sales injury caused by Belmora's misrepresentations of source. Or, put another way, BCC must allege (and ultimately prove) that it is more than a "mere intermeddler[]."*Ritchie v. Simpson*, 170 F.3d 1092, 1095 (Fed. Cir.

58

1999). For the reasons already discussed at length, BCC is no mere intermeddler when it comes to Belmora's misappropriation of BCC's commercial reputation.

### D. The Benefits of Federal Trademark Registration do not Extend to Parties Like Belmora who Seek Primarily to Deceive American Consumers.

As the Supreme Court recently reminded us, "[t]he benefits of registration are substantial." *B&B Hardware Inc. v. Hargis Industries, Inc.*, 575 U.S. __, 135 S. Ct. 1293, 1310 (2015).[20] These benefits are affirmative benefits granted by Congress so merchants can protect their business reputations and so consumers are protected from commercial

---

[20] The Court explained:

> The Lanham Act confers "important legal rights and benefits" on trademark owners who register their marks. 3 McCarthy § 19:3, at 19–21 see also *id.,* § 19:9, at 19–34 (listing seven of the "procedural and substantive legal advantages" of registration). Registration, for instance, serves as "constructive notice of the registrant's claim of ownership" of the mark. 15 U.S.C. § 1072. It also is "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate." § 1057(b). And once a mark has been registered for five years, it can become "incontestable." §§ 1065, 1115(b).

*B & B Hardware, Inc.*, 135 S. Ct. at 1300.

deception. *See* 15. U.S.C. § 1127. Belmora seeks these benefits for the exact opposite reason: to trade on BCC's reputation and to deceive Mexican-American consumers into believing, wrongly, that Belmora's FLANAX is the authentic FLANAX those consumers have known and trusted "for generations." J.A. 196. Belmora's continued registration of its FLANAX mark turns the protections of the Lanham Act on their head. Section 14(3) operates to cut off the statutory privileges of registration that Belmora has enjoyed for far too long.

III. **BHC Has Adequately Alleged a Claim for False Advertising Under Section 43(a)(1)(B) of the Lanham Act Because, as a Direct Competitor of Belmora, it Suffers Lost Sales from Belmora's Misrepresentations to Consumers.**

Belmora's misrepresentations have not only injured consumers and BCC, they have also injured BHC. Belmora has sold its product under false pretenses, poaching sales that would otherwise go to competitors, including BHC. As the maker of ALEVE, the market leader for naproxen sodium pain relievers, BHC has suffered damage. But the District Court, relying yet again on *Lexmark*, denied as implausible BHC's claims that it suffered commercial injuries resulting from Belmora's false advertising.

The District Court's ruling dismissing BHC's false advertising claim against its direct competitor is directly contrary to *Lexmark*. J.A. 494-95. In *Lexmark*, the Court described "diversion of sales to a direct competitor" as "the paradigmatic direct injury from false advertising." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1393 (2014). Belmora's misrepresentations about its FLANAX product have diverted sales from BHC by deceiving consumers into buying FLANAX rather than another naproxen-sodium product—such as ALEVE. The District Court's order dismissing BHC's false advertising claims should therefore be reversed.

## IV. BCC's Commercial Injuries Caused by Belmora's False Designation of Origin Likewise Apply to BCC's False Advertising Claim.

As it did with BCC's false designation of origin claim under Section 43(a)(1)(A), the District Court's order dismissed BCC's false advertising claim under Section 43(a)(1)(B) on the ground that BCC failed to allege a commercial injury to reputation or sales. J.A. 495 (citing *Lexmark*, 134 S. Ct. at 2234). Again, the District Court's order erred because BCC has alleged Lanham Act injuries caused by Belmora's false advertising.

61

First, BCC's FLANAX brand enjoys a considerable reputation in the United States. J.A. 191. By trading on this reputation, Belmora has robbed BCC of "the ability to control its reputation and [BCC] thus suffers damage." J.A. 190-91.

Second, BCC has alleged facts which show (1) that it has lost sales of its FLANAX product in the U.S.-Mexico border region as a result of Belmora's false statements, (2) that Belmora is trading on BCC's goodwill to compete directly with BCC's sister company, BHC, (3) and that Belmora's business strategy improperly interferes with Bayer's global branding strategy for its naproxen sodium products. Both the likely harm to sales and the likely reputational harm caused by Belmora's misrepresentations are cognizable injuries under the Lanham Act's false advertising provision, Section 43(a)(1)(B).

## V. Bayer's California Claims Should be Reinstated Because the District Court Erroneously Dismissed Bayer's Related Federal Claims.

Finally, Bayer's state law claims should be reinstated. Bayer does not dispute that the District Court was acting within its discretion to decline to exercise supplemental jurisdiction over those claims once it had dismissed Bayer's federal claims. J.A. 495-96. But the District

Court erred in dismissing Bayer's federal claims. Accordingly, just as Bayer's federal claims should be reinstated, so should Bayer's related state law claims.

## CONCLUSION

Belmora has blatantly copied BCC's FLANAX brand and traded on BCC's goodwill in an effort to deceive consumers and compete unfairly against BCC and BHC. The only question is: are BCC—the owner of the goodwill Belmora is trading on—and BHC—Belmora's direct competitor in the U.S.—the proper parties to bring this suit? The answer is yes.

BCC's and BHC's customers in the U.S.—past, present, and potential—are the targets of Belmora's deceptive marketing strategy. These consumers—predominantly Mexican-American, largely new arrivals to our country—are being tricked by Belmora into buying a product, and spending more for a brand name, because they are being deceived into believing that it is the brand they know and trust from back home.

These "hoodwinked" consumers, however, are not entitled to sue on their own behalf. *Lexmark*, 134 S. Ct. at 1390. Instead, the Lanham

Act relies on businesses like BCC and BHC to bring claims to vindicate their own interests, and thereby to vindicate the interests of their consumers. *See TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 827 (9th Cir. 2011) (Kozinski, J.) (describing a Lanham Act plaintiff's role as "the fabled vicarious avenger of the consuming public").

BCC has a keen interest in protecting its substantial reputation in its FLANAX brand from Belmora's bad-faith misappropriation. Both BCC and BHC have an interest in prohibiting Belmora from trading on that reputation to drive consumers away from Bayer and towards Belmora. And by protecting its own interests, Bayer is ensuring that the Lanham Act's consumer protection provisions extend to the millions of Mexican-American consumers whom Belmora has, for more than ten years and with utter impunity, deceived and exploited for its own profit.

Because BCC and BHC have been directly injured by Belmora's deceptive conduct, the District Court's order should be reversed with respect to BCC's claims under Sections 14(3), 43(a)(1)(A), and 43(a)(1)(B) of the Lanham Act, with respect to BHC's claims under Section 43(a)(1)(B) of the Lanham Act, and with respect to both parties'

California state law claims, and this case should be remanded for

further proceedings.

RESPECTFULLY SUBMITTED    By:    /Phil Barengolts/

Phillip Barengolts
Bradley L. Cohn
Andrew R.W. Hughes
PATTISHALL, MCAULIFFE,
NEWBURY, HILLIARD &
GERALDSON LLP
200 South Wacker Drive
Suite 2900
Chicago, IL 60606
Tel: (312) 554-8000
pb@pattishall.com
blc@pattishall.com
arh@pattishall.com

Robert J. Shaughnessy
Eric C. Wiener
WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C. 20005
Tel: (202) 434-5000
bshaughnessy@wc.com
ewiener@wc.com

*Attorneys for Bayer Consumer Care
AG and Bayer HealthCare LLC*

65

## REQUEST FOR ORAL ARGUMENT

As detailed above, this case raises complex issues concerning the reach of the Lanham Act, the public's interest in being protected from consumer deception, and the proper interpretation of recent Supreme Court and Fourth Circuit precedent. The District Court's opinion also creates a conflict with case law of the United States Court of Appeals for the Federal Circuit and the Trademark Trial and Appeal Board. Accordingly, Appellants respectfully request that this Court grant them oral argument on the issues presented by this appeal, pursuant to Local Rule 34(a).

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this brief contains 13,092 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in  14-point  font size in Century.


/Phil Barengolts/
Phillip Barengolts
*Attorney for Bayer Consumer Care AG and Bayer HealthCare LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of May 2015 I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the parties' counsel of record.

/Phil Barengolts/
Phillip Barengolts
*Attorney for Bayer Consumer Care AG and Bayer HealthCare LLC*